UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM D. HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19 CV 30 ACL |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff William D. Howard brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of his applications for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act.

An Administrative Law Judge ("ALJ") found that, despite Howard's severe impairments, he was not disabled as he had the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be reversed and remanded.

### I. Procedural History

Howard filed his applications for benefits on December 18, 2015, claiming that he became unable to work on September 12, 2012. (Tr. 198-212.) He alleged disability due to a blood clot in his left leg and stomach pain. (Tr. 248.) Howard was 33 years of age at his alleged onset of disability. (Tr. 25.) His application was denied initially. (Tr. 90-94.) Howard's claim was denied by an ALJ on July 31, 2018. (Tr. 16-26.) On March 29, 2019, the Appeals Council denied Howard's claim for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Howard first argues that the ALJ committed reversible error by failing to make a finding concerning residual functional capacity that was supported by substantial evidence. He next argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of Howard's deficiencies.

### II. The ALJ's Determination

The ALJ first found that Howard met the insured status requirements of the Act through September 30, 2018. (Tr. 18.) He next found that Howard had not engaged in substantial gainful activity since September 12, 2012, the alleged onset date. (Tr. 19.) In addition, the ALJ concluded that Howard had the following severe impairment: deep vein thrombosis ("DVT"). *Id.* The ALJ found that Howard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 20.)

> As to Howard's RFC, the ALJ stated:
>
> > After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he is able to lift or carry 10 pounds frequently and 20 pounds occasionally; he can sit for 6 hours in an 8-hour workday; he can stand and/or walk for 6 hours in an 8-hour workday; he can occasionally climb ramps and stairs, but no climbing ladders, rope or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he will need to avoid hazards, such as dangerous machinery and unprotected heights; and he will need to avoid working with sharp objects that could cause cutting or puncture wounds.

*Id.*

The ALJ found that Howard had no past relevant work, but was capable of performing other jobs existing in significant numbers in the national economy, such as photocopy machine operator, router, and marking clerk. (Tr. 24-25.) The ALJ therefore concluded that Howard was not under a disability, as defined in the Social Security Act, at any time from September 12, 2012, through the date of the decision. (Tr. 26.)

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on December 18, 2015, the claimant was not disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income protectively filed on December 18, 2015, the claimant is not disabled under section 1614(a)(3)(A).

*Id.*

### III.  Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389,

401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

### III.B.  Determination of Disability

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment.  If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience.  20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to

determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.  20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4).  "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations."  *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1).  The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources."  20 C.F.R. § 416.945(a)(3).  The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations.  *See id.*  If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled.  *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience.  *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000).  The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v).  If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled.  If the claimant cannot make an adjustment to other work, then the Commissioner

will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### IV. Discussion

Howard first argues that the ALJ's RFC determination was not based upon substantial evidence because it did not include Howard's need to elevate his lower extremity due to chronic edema. He contends that this limitation is supported by the opinion of medical expert Subramaniam Krishnamurthi, M.D., as well as the opinion of examining physician Scott Bartkoski, M.D.

The ALJ acknowledged that Howard experienced edema in his left leg due to his DVT. (Tr. 22-23.) He stated that, while the examinations of record "showed that the claimant exhibited left lower extremity edema, the record supports that his leg swelling improved with treatment." (Tr. 22.) The ALJ noted that Howard exhibited 3+ pitting edema after his emergency room visit near his alleged onset date; however, the subsequent treatment records do not show edema of such severity. *Id.* He stated that, although Howard testified that he elevated his leg above his heart for an hour with every one-and-a-half hours of sitting or standing, there was no acceptable medical source supporting this was medically necessary. *Id.*

It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Pearsall*, 274 F.3d at 1217. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*,

471 F.3d 902, 907 (8th Cir. 2006).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  There is no requirement, however, that an RFC finding be supported by a specific medical opinion.  *See Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012); *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011) (An ALJ "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.").  Furthermore, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Cox*, 495 F.3d at 619-20.

In determining Howard's RFC, the ALJ first discussed the medical evidence of record. He stated that Howard's care for his DVT was generally routine and conservative, consisting of medication refills.  (Tr. 22.)  He noted that a vein study performed in September 2017 revealed no evidence of deep venous insufficiency of the bilateral lower extremity.  *Id.*  The ALJ stated that Howard's examinations consistently revealed full strength of the lower extremities, he was in no acute distress, and he did not require an assistance device with standing or walking.  *Id.* He noted that, despite his complaints of chronic leg pain, he was not taking any medication for his pain other than Tylenol in March 2016.  (Tr. 22-23.)  The ALJ pointed out that Medicaid disability examiner Dr. Bartkoski stated that Howard's "pain could be better controlled with stronger pain medications which may increase his chance of working."  (Tr. 369, 23.)  The ALJ stated that Howard's activities of daily living support an RFC for less than the full range of light work.  (Tr. 23.)  For example, he noted that Howard was able to prepare simple meals daily, fold laundry, wash dishes, and grocery shop.  *Id.*

The ALJ next evaluated the medical opinion evidence. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)). The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise,* 641 F.3d at 927. Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012). Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion. 20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

At a supplemental hearing held on May 10, 2018, the ALJ obtained testimony from medical expert Dr. Krishnamurthi, a specialist in internal medicine and cardiology. (Tr. 31, 400.) Dr. Krishnamurthi testified that, after reviewing the medical record, he found that

Howard had problems with anticoagulation.  (Tr. 34.)  He expressed the opinion that Howard had the following work-related physical limitations: able to lift ten pounds frequently and twenty pounds occasionally; sit six hours out of an eight-hour workday; stand and walk together for six hours out of an eight-hour workday; no climbing ladders, scaffolds, or ropes; occasional bending, stooping, crawling, and crouching; and should avoid contact with sharp objects.  (Tr. 35.)  Dr. Krishnamurthi testified that Howard would likely experience symptoms of leg pain and some edema due to his anticoagulation and DVT.  (Tr. 36.)  Dr. Krishnamurthi stated:

> But I didn't see much of the edema.  But I think—I saw, most of the time, edema.  But I still think it's all anticoagulation.  Chronic anticoagulation.  There's a possibility that they can have.  So that, kind of I figured out into my—in the written prescriptions.  And then pain, as well; some swelling in the legs possible.  Those are the things that I consider that are objective findings.  Respect then, causing anticoagulation.  That's chronic anticoagulation.  They've had to find probably—I thought I saw that.  So I considered these things.

(Tr. 36-37.)

When asked by Howard's counsel what causes stasis dermatitis,[1] Dr. Krishnamurthi responded "[y]ou can have the leg edema stays all the time.  You know, the edema leg stays all the time.  That can cause the stasis dermatitis."  (Tr. 37.)  He further explained that "the swelling in the leg, from the stretches, the scaling, and that causes the stasis dermatitis."  *Id.*  The following exchange then occurred:

> [Counsel]: And that's caused by having leg edema all the time?
>
> [ME]: Yeah.  Now on a chronic basis, not basis [phonetic].
>
> [Counsel]: On a chronic basis.
>
> [ME]:  Should be there on it all the time.  Then, you know, the skin gets stretched out, and then the venous and the blood is there all the time.  That causes the—

---

[1]Erythema and scaling of the lower extremities due to impaired venous circulation secondary to deep vein thrombosis; with rapid onset and swelling.  *Stedman's Medical Dictionary*, 519 (28th Ed. 2006).

> [Counsel]: That is not caused if the person rarely has edema. Is that correct?
>
> [ME]: Correct.
>
> [Counsel]: Okay.
>
> [ME]: If it comes and goes, it may not. But if you have a continuous basis, then that will—causes stasis dermatitis.

(Tr. 37-38.) Dr. Krishnamurthi testified that Howard's edema may worsen if his leg was in a dependent position or if he walks. (Tr. 38.) Counsel asked Dr. Krishnamurthi if it was recommended to keep the feet elevated above the heart when an individual has dependent edema. *Id.* Dr. Krishnamurthi stated:

> [inaudible], not above the heart. I think, probably, they have a—if you have somebody who has a chronic edema…then I think they recommend they do it in the afternoon, sometimes, to keep the—lie down and then keep the legs up, you know, two or three feet above the—below the legs. And that's what they recommend. And they also—for nighttime, also, they recommend a [inaudible] shoulders there. The fluid just go down, you know, just—so they recommend, yes.

(Tr. 39.) Finally, counsel questioned Dr. Krishnamurthi as follows:

> If you had a patient who had chronic edema—and what I mean by that is, if it's so chronic that it's causing the stasis dermatitis changes, do you believe it would be important for them to elevate their—that lower extremity?

*Id.* Dr. Krishnamurthi responded, "Yes. Yes." *Id.*

The ALJ stated that he was assigning "great weight" to the opinions of Dr. Krishnamurthi because they were supported by the record. (Tr. 23.) The ALJ noted that Dr. Krishnamurthi specializes in cardiology and had reviewed all the medical evidence of record. *Id.* He stated that Howard's edema improved with treatment, he had full strength in the lower extremities, and he did not require the use of an assistive device. *Id.* The ALJ further explained that Howard's

daily activities support Dr. Krishnamurthi's opinion that Howard can perform less than the full range of light work.  *Id.*

Howard argues that the ALJ erred in assigning great weight to Dr. Krishnamurthi's opinion because his opinion that Howard could perform work that required standing most of the time is inconsistent with his testimony regarding Howard's edema.

The undersigned agrees that Dr. Krishnamurthi's testimony is internally inconsistent in multiple respects.   First, Dr. Krishnamurthi testified that he did not "see much of the edema" in the medical record.   (Tr. 36.)   This conflicts with his subsequent testimony that stasis dermatitis, from which Howard suffers, only occurs in patients with "chronic" or "continuous" edema, and would not occur if the patient experiences edema "rarely."   (Tr. 37.)   Defendant does not dispute that Howard has been diagnosed with stasis dermatitis.

Second, upon questioning by Howard's attorney, Dr. Krishnamurthi testified that Howard's edema would worsen when his leg is in a dependent position and when he is walking.  (Tr. 38.)   He further testified that it would be important for a patient with chronic edema to elevate his lower extremity.   (Tr. 39.)   Dr. Krishnamurthi, however, failed to explain how an individual could stand and walk for six hours out of an eight-hour workday if standing resulted in increased edema and the need to elevate the legs.   Sitting for six hours in an eight-hour day would pose the same problem, provided the legs are in a dependent position while sitting.   Dr. Krishnamurthi did not include a need to elevate the legs during the workday in his RFC opinion.  Notably, the vocational expert testified that the need to elevate one's legs above the heart for one hour every one-and-a-half hours after either standing or sitting with the feet in a dependent position would preclude jobs unless the employer allowed an accommodation.   (Tr. 42-43.)

The medical evidence reflects frequent findings of edema and stasis dermatitis of the left lower extremity.   Howard received treatment for his DVT at Midland Community Healthcare Services from November 2012 through July 2015.  (Tr. 324-48.)   On his initial visit on November 27, 2012, it was noted that Howard had been in the emergency room for pain and edema in his left leg and had been diagnosed with DVT.  (Tr. 324.)   Upon examination, edema and 3+ pitting was noted in the left leg.  (Tr. 325.)   On December 18, 2012, pedal edema in the left leg to the knee and palpable veins in the left thigh were noted.  (Tr. 327.)   Edema was absent on examination at Howard's follow-up visits in January 2013, March 2013, and June 2013.  (Tr. 333, 336, 338.)   On October 30, 2013, it was noted that Howard had been in the emergency room due to edema that had been present for one month.  (Tr. 340.)   Upon examination, edema was noted in the lower extremities, the left calf greater than the right.  *Id.* Edema was absent at Howard's next visit in July 2014.  (Tr. 343.)   On July 20, 2015, Howard complained of left ankle pain.  (Tr. 347.)   Howard had difficulty with his gait and edema of the left leg was noted.  *Id.*  The examining physician, Federico Ilang-Ilang, M.D., instructed Howard to be non-weightbearing on the left extremity and to elevate and apply ice to the left extremity.  (Tr. 348.)   Howard underwent a Medicaid disability exam performed by Dr. Bartkoski on February 29, 2016.  (Tr. 368.)   Upon examination, Dr. Bartkoski noted edema in the left leg, with the left calf significantly more swollen than the right calf.  (Tr. 369.)   He also noted "significant anterior stasis dermatitis changes," mild tenderness to palpation of the calf region, reduced plantar and dorsiflexion both passively and actively, slightly diminished pedis pulse, and Howard walked with a limp favoring the right side.  *Id.*  Howard saw Michael Ryan, M.D. for a consultation regarding his leg pain on September 6, 2017, at which time edema was noted on examination.  (Tr. 381.)   Howard saw Eddie W. Runde, M.D., for a consultative

examination at the request of the state agency on November 27, 2017. (Tr. 386.) Upon examination, Dr. Runde noted stasis dermatitis at the distal left calf and foot, no left posterior tibial pulse, a barely palpable dorsalis pedis pulse, reduced range of motion of the left knee, and a gait notable for a limp favoring the left lower extremity. (Tr. 37.) Howard had to frequently change positions between sitting and standing. *Id.* Howard saw nurse practitioner Connie Dunn, APRN-CNP from September 2017 through March 2018. (Tr. 401-24.) Ms. Dunn noted trace edema and some staining on the left lower extremity in September 2017. (Tr. 402.) On December 11, 2017, Ms. Dunn noted bilateral staining. (Tr. 405.) She noted "chronic discoloration" of the left lower extremity in March 2018. (Tr. 416.)

With regard to the opinion evidence of record, the ALJ addressed and assigned "little" or "limited" weight to the opinions of Drs. Runde, Ilang-Ilang, and Bartowski. (Tr. 23-24.) Dr. Runde completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" on November 27, 2017. (Tr. 389-94.) He expressed the opinion that Howard was capable of continuously lifting/carrying up to 10 pounds, frequently lifting/carrying 11 to 20 pounds, and occasionally lifting/carrying 21 to 50 pounds; could sit for two hours at a time and sit a total of six hours in an eight-hour workday; could stand 30 minutes at a time and stand a total of two hours in an eight-hour workday; and could walk 15 minutes at a time and walk a total of one hour in an eight-hour workday; could only occasionally operate foot controls with his left foot and could frequently operate foot controls with his right foot; could never climb stairs, ramps, ladders, or scaffolds; could never balance, kneel, crouch, or crawl; could occasionally stoop; could never be exposed to unprotected heights, moving mechanical parts, extreme cold or heat, or vibrations; could never operate a motor vehicle; could occasionally be exposed to humidity and wetness and dust, odors, and fumes; could be exposed to moderate

noise; could not travel without a companion for assistance, ambulate without using an assistive device, or walk a block at a reasonable pace on rough or uneven surfaces.  *Id.*

The ALJ indicated that he was assigning limited weight to Dr. Runde's opinions because they were inconsistent with the overall record.  (Tr. 23.)  He stated that Dr. Runde's report does not indicate that he had the opportunity to review all of the medical evidence of record as Dr. Krishnamurthi had done.  *Id.*  The ALJ found that Dr. Runde's opinion regarding limitations on lifting, carrying, sitting, standing, walking operation of foot controls, and postural activities are not supported by the record.  *Id.*  He stated that the record does not support the significant limitations as to standing and walking.  *Id.*  The ALJ noted that Howard testified at the hearing that he could stand for three to four hours during the relevant period, and the medical record indicates he ambulated without assistance and had full strength in the lower extremities.  *Id.*  He further discredited Dr. Runde's opinion regarding environmental restrictions, noting they were generally based on what was reasonable for the average person rather than Howard's records.  (Tr. 23-24.)

The ALJ next addressed the opinion of examining physician Dr. Ilang-Ilang.  (Tr. 24.)  In July 2015, Dr. Ilang-Ilang instructed Howard to be non-weightbearing on the left extremity, and to elevate and apply ice as directed.  (Tr. 24, 348.)  The ALJ stated that the longitudinal record does not support that Howard was to be non-weightbearing for the durational period, as he did not use an assistive device during the relevant period.  (Tr. 24.)  With regard to elevating and icing his lower extremity, the ALJ found this opinion was vague, because it does not indicate the frequency or duration of such limitation.  *Id.*  The ALJ concluded that Dr. Ilang-Ilang's opinion does not support Howard's need to ice and elevate his leg would cause vocationally relevant limitations during the workday.  *Id.*

Finally, the ALJ discussed the opinion of Dr. Bartowski. Dr. Bartowski stated that Howard experiences chronic left leg pain, which increases with standing or sitting for one hour. (Tr. 367.) He indicated that Howard walks with a limp, and has decreased range of motion of the knee and ankle. *Id.* Dr. Bartowski expressed the opinion that Howard's left leg pain limited him to standing or sitting less than one hour. *Id.* The ALJ stated that Dr. Bartowski's opinion was based upon Howard's own self-reports, as he reported the limitation of sitting or standing in the same place for one hour. (Tr. 24.) He noted again that Howard acknowledged at the hearing that he could stand for three to four hours during the relevant period. *Id.* The ALJ further stated that Dr. Bartowski's report does not indicate that he was able to review the overall medical evidence of record showing that his conditions were generally controlled with medication management. *Id.*

The ALJ concluded that Howard had the RFC to perform light work with the following limitations: he is able to lift or carry 10 pounds frequently and 20 pounds occasionally; he can sit for six hours in an eight-hour workday; he can stand and/or walk for six hours in an eight-hour workday; he can occasionally climb ramps and stairs, but no climbing ladders, rope or scaffolds; he can occasionally balance, stoop, kneel, crouch, and crawl; he will need to avoid hazards, such as dangerous machinery and unprotected heights; and he will need to avoid working with sharp objects that could cause cutting or puncture wounds. (Tr. 20.) He stated that this RFC assessment was supported by Howard's "testimony and allegations, the medical evidence, his treatment history, his activities of daily living, and the opinion of Dr. Krishnamurthi." (Tr. 24.)

The undersigned finds that the ALJ's RFC determination is not supported by substantial evidence on the record as a whole. The ALJ relied upon the opinion of Dr. Krishnamurthi but, as previously discussed, Dr. Krishnamurthi's opinion is internally inconsistent and does not

support the ALJ's determination.  Specifically, Dr. Krishnamurthi acknowledged that an individual who experiences edema to the extent that he suffers from stasis dermatitis should elevate his lower extremity, and that the edema would worsen if the leg was in a dependent position or if the individual walks.  These limitations are inconsistent with the performance of light work, particularly sitting and walking for six hours out of an eight-hour workday, with no limitation of elevating the lower extremity.

Significantly, all of the other examining physicians who provided opinions regarding Howard's work-related limitations found greater restrictions than those found by the ALJ.  Dr. Runde found that Howard, among other limitations, could only stand thirty minutes at a time and stand a total of two hours and could walk fifteen minutes at a time and walk a total of one hour. (Tr. 389.)  Dr. Ilang-Ilang found that Howard should be non-weightbearing on the left extremity and that he should elevate and apply ice to the left lower extremity.  (Tr. 348.)  Dr. Bartowski expressed the opinion that Howard's left leg pain limited him to standing or sitting less than one hour.

One of the ALJ's cited reasons for discrediting these greater restrictions was Howard's hearing testimony that he was able to stand for three to four hours during the relevant period. Howard testified that he alleged September 12, 2012 as his onset of disability date because he was first diagnosed with DVT on that date.  (Tr. 57.)  He testified that, at this time, he could be on his feet "a few hours" and he was able to sit longer than that.  *Id.*  Upon questioning by the ALJ, Howard testified that he "probably" could have performed a "sit-down" job in September 2012. (Tr. 58.)  Howard, however, explained that his condition worsened "a few months" after his onset of disability date, and that he currently has to elevate his leg every day for periods of an hour every hour-and-a-half due to swelling.  (Tr. 59-60.)

The ALJ also assigned little weight to the opinions of the examining physicians because he found that the medical record indicated Howard ambulated without assistance and had full strength in the lower extremities.  The record does consistently note these findings on examination.  As discussed above, however, the record also notes significant edema, stasis dermatitis, and an impaired gait.  For example, Dr. Bartowski's opinions were based on examination findings of edema in the left leg, significant stasis dermatitis changes, tenderness to palpation of the calf, reduced plantar and dorsiflexion, diminished pedis pulse, and a limp when walking.  (Tr. 369.)  Similarly, Dr. Runde noted stasis dermatitis, no left posterior tibial pulse, a barely palpable dorsalis pedis pulse, reduced range of motion of the left knee, and a gait notable for a limp favoring the left lower extremity.  (Tr. 387.)  Dr. Ilang-Ilang's opinion that Howard should be non-weight-bearing was based on his findings of edema of the left leg and difficulty walking.  (Tr. 348.)  The ALJ rejected this opinion, noting that it was vague because it did not indicate the frequency or duration of the restriction.  (Tr. 24.)

In sum, although the ALJ did not have to choose an opinion on which to rely, the Court finds that the ALJ's RFC determination lacks the support of "some medical evidence."  None of the medical evidence of record supports the ALJ's determination that Howard is capable of sitting and standing/walking for six hours a day without additional limitations to allow him to elevate his leg.  The hypothetical question the ALJ posed to the vocational expert was based on this erroneous RFC.

The current record, however, is unclear as to the length and duration of a restriction of elevating the lower left extremity.  Further, in light of Howard's testimony that he was able to sit and stand for longer periods for at least the first few months after his alleged onset of

disability, it must be determined when this restriction first began.   ALJs have a duty to fully and fairly develop the record.   *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

Accordingly, the Court reverses and remands the case to the ALJ for further consideration.   Upon remand, the ALJ should obtain additional medical evidence from a medical examiner or medical expert regarding Howard's ability to function in the workplace. The physician should specifically consider whether Howard must elevate his lower extremity during the workday; and, if so, how often, for how long, and the date this restriction began.

                                          **/s/** Abbie Crites-Leoni
                                          ABBIE CRITES-LEONI
                                          UNITED STATES MAGISTRATE JUDGE

Dated this 15th day of September, 2020.